Filed 3/13/23  Russell v. Zitani CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

<table>
<tr><td>TROY ALLEN RUSSELL et al.,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>KATHLEEN ANN ZITANI et al.,<br><br>        Defendant and Appellant.</td><td>A162798, A162878<br><br>(Alameda County<br>Case No. RG18916045)</td></tr>
</table>

A car driven by Kathleen Zitani collided into Troy Russell, a pedestrian, at an intersection in Oakland.  Russell suffered debilitating injuries.  Russell and his spouse (collectively "the Russells") sued Zitani, the City of Oakland ("the City"), and others.

The Russells brought a premises liability claim against the City based on a dangerous condition of public property, specifically that overgrown vegetation in a center median affected the sightlines between Zitani and Russell and was a substantial factor in the accident.  Zitani filed a cross-complaint against the City for indemnity.  The trial court granted the City's motion for summary judgment, finding that no triable issue existed on the issue of causation because Zitani testified in deposition that solar glare prevented her from seeing Russell.

In separate appeals that we have consolidated for purposes of argument and this opinion, the Russells and Zitani (collectively "Appellants")

each contend the trial court erred in granting the City summary judgment because the evidence raised a triable issue of fact regarding whether the vegetation in the median was a substantial factor leading to the collision. As the evidence – including all reasonable inferences drawn from the evidence – would allow a trier of fact to find causation, we reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Accident

The accident giving rise to this case occurred at the intersection of 40th Street ("40th") and Opal Street ("Opal") in Oakland. 40th is a four-lane road running generally east-west, with two lanes in each direction. Opal, a two-lane street running generally north-south with one lane in each direction, intersects 40th. At this intersection, traffic on 40th is unregulated, whereas stop signs on Opal regulate traffic. On the east side of the intersection on 40th, there is a marked ladder crosswalk but no crosswalk on the west side. On 40th, between Opal and Shafter Avenue – the street one block west of Opal – a median with vegetation separates the two directions of traffic (the "Median"). Several of these features are depicted in the following diagram, an aerial image of the intersection from Google Earth[1]:

_____

[1] This diagram was included in the City's summary judgment motion as an exhibit to the declaration of Kristen White, a mechanical engineer who inspected, measured, and photographed the intersection.



In this section of 40th, the posted speed limit is 30 mph.

With respect to the accident, the following facts are undisputed. On September 28, 2017, sometime between 7:45 a.m. and 8:00 a.m., Zitani was driving her Honda Civic to work and turned onto 40th. For the last 18 months, Zitani had driven this same route to work four mornings each week and was familiar with the road. As she proceeded east on 40th, the sun began to obscure her vision, which she anticipated at this time of the year. She lowered the visor and slowed to 25 mph. As was her habit while driving, Zitani constantly scanned the road ahead of her to look for upcoming traffic signals and pedestrians in crosswalks. Even with the sun's glare, she could see the road ahead of her.

While Zitani was traveling eastbound on 40th in the left lane, Troy Russell was walking south on Opal and began crossing 40th. While Russell

3

was crossing, Zitani's car struck him. Russell flew into the windshield, rolled down the hood of the car, and landed on the ground semiconscious and bleeding from his head. Zitani's car stopped just east of the marked crosswalk.

## B. The Lawsuit

On August 8, 2018, the Russells sued Zitani, the City, and others, asserting causes of action for negligence, premises liability based on a dangerous condition of public property, and loss of consortium, among other claims. The premises liability claim in particular alleged that Zitani and Russell did not see each other due to the dangerous condition of the intersection. The claim was based on overgrown vegetation in the Median which purportedly interfered with sightlines and caused the accident. It was further alleged that Russell had sustained catastrophic injuries including a massive traumatic brain injury that had left him with permanent and debilitating injuries. On October 4, 2018, the State Compensation Insurance Fund ("SCIF"), the workers' compensation carrier for Russell's employer, filed a separate action, Case No. RG18933422, seeking reimbursement of workers' compensation benefits paid for injuries suffered by Russell.

In its answer to the Russells' complaint, the City generally denied the allegations and asserted several affirmative defenses. Zitani did the same. Zitani also filed a cross-complaint against the City and other defendants for equitable indemnity, apportionment of fault, and declaratory relief. She claimed that if she were held liable for any damages sustained by the Russells, she would be entitled to indemnity from the City and the other cross-defendants with respect to any losses she might sustain as a result of their negligence.

4

## C.    Discovery

In June 2019, Zitani was deposed.  The following exchange took place between the Russells' counsel and Zitani:

Q:    So is it your testimony that you didn't see [Russell] until you effectively hit him?

A:    That is my testimony.

Q:    And simultaneously you applied your brakes?

A:    Yes.

Q:    Now, I know accidents all happen in a blink of the eye.  So --

A:    I didn't see him.  I saw him as a I hit hm.  That's all I could tell you.

Q:    I take it you were being as careful as you could be when you were driving?

A:    Yes.

Q:    And, in fact, in your mind's eye you don't think there's anything you could have done to prevent the incident?

A:    No.

Q:    Correct?

A:    Correct.  I mean in hindsight, yeah, I could be going five miles an hour but that that moment, no.  At that moment I – the sun was just glaring.  I seriously didn't see him.  I didn't – I didn't see him crossing.  I just realized that when I saw him, my car hit him.  That's the only time I saw him.

. . .

Q:    Just to be clear, you didn't see my client at any time until you struck him, correct?

A:    Correct.

Later, the following exchange took place between counsel for the City and Zitani:

Q:    So the sun glare caused you to not see Mr. Russell; is that right?

[Objections from other counsel]

A:    Yeah.

[Objections and instructions from counsel]

A:    It was the sun.

Q:    Okay. Was there anything else other than the sun that caused you to not see Mr. Russell?

[Objections from counsel]

A:    No, I don't.

Plaintffs' Counsel:    Pardon me, the answer was no, I don't know?

A:    No. No, it was the sun. I tell you it was the sun. I hit him because I didn't see him. The sun was right there and I didn't see him.

Q:    Okay. Was there anything -- any other condition on the road that you felt caused the incident?

[Objections]

A:    No.

. . . .

Q:    Okay. And was there anything else other than your not seeing Mr. Russell that caused the accident?

A:    Just the sun.

Q:    Okay. So other than the glare from the sun, was there any other obstruction to your vision?

[Objections]

A:    No.

. . . .

Q:     Okay.  So in your opinion, is there anything – anything that the City could have added or taken away on the road that would have made it safer for you?

[Objections]

A:     I'd say a stoplight right there.

In later questioning by counsel for SCIF, counsel presented Zitani with exhibits represented to be depictions of the 40th and Opal intersection, including the following Exhibit 4:



https://www.google.com/maps/place/Opal+St+%26+40th+St,+Oakland,+CA+94609 Russell AA 833

Zitani stated that Exhibit 4 looked like a fair and accurate description of the median on 40th in her direction at the time of the accident but acknowledged

7

she did not know where Opal was in the image. SCIF counsel and Zitani proceeded to have the following exchange:

Q: Okay. Do you recognize the vegetation in Exhibit 4 to be an accurate depiction of the vegetation leading up to Opal Street in your direction of travel at the time of the accident?

[Objections]

A: Um, I mean if you're asking me am I aware of the vegetation, I'm aware of the vegetation. If you're asking me do I know exactly where the tree was in comparison to Opal, I really can't tell you. It has nothing to do with anything that caused this incident.

. . . .

Q: Okay. Now, do you agree that – if you were looking down perspective in Exhibit 4 –

A: Uh-huh.

Q: – some of the vegetation, including that very large tree, blocks your view of part of the crosswalk coming from Opal Street?

[Objections]

A: Yeah, I – I –I think I pretty much answered. I – I – if it's possible, yes, anything is possible, but what caused the accident was the sun, the direct sun through my window at the time I was entering the crosswalk. I didn't see him and --

Q: Sure. When you say "possible," you're saying it's possible that the vegetation obstructed your view of Mr. Russell as he was crossing the crosswalk, correct?

[Objections]

8

A: I really don't know how to answer that. I don't – if you want a truthful answer, I don't think it was the vegetation that impeded my view. It was the sun.

. . .

Q: -- regardless of what time it was, whether it was the time of the accident or before the accident, would you agree that assuming that [Exhibit 4] is an accurate depiction of 40th Street, 40th Street coming up to Opal Street in your direction of travel, that the vegetation, including that very tall tree or the tall tree, blocks the driver's view of part of the crosswalk coming across Opal Street?

[Objections and instructions from counsel]

A: Yeah. I mean is it possible, yes. If – if that's your – if you're saying – I could see where it can impede vision, but right after this tree there's a small clearing. I don't remember vegetation to be a problem.

. . . .

Q: Okay. And would you agree that when you are scanning while you're behind these trees, that at least at some part of those times your view of Opal Street and the crosswalk would have been obstructed at least part of the cross walk?

[Objections]

A: Um, I mean I can't say for sure. It wasn't the trees that – that impeded my vision, it was the sun.

. . . .

Q: So at the time of the accident just prior to the accident happening, maybe a few seconds before –

A: (Nods head up and down)

9

Q:     -- are you saying the glare of the sun was so complete that you couldn't see anything or can you describe to me exactly what you could and couldn't see?

[Objections and instructions]

A:     . . . I mean yes, the sun was blinding.  The sun was blinding enough that I didn't see.

Q:     Sure.  But could you see – what could you see?

A:     I mean I could see the road.  I just didn't see the man – I didn't see Mr. Russell.

Q:     Okay.  In terms of what you could see, you could see the road. How far ahead could you see?

A:     Oh, I don't know.  I mean it's kind of I'm automatic pilot when I'm on that road because I take it a lot.  So, um, truthfully, I can't really answer how.  I mean the sun was pretty blinding in that intersection enough that I didn't see him.  So it had to be pretty blinding for me not to see him.

. . . .

Q:     . . . . Ms. Zitani, if we can go back to Exhibit 4.  If you look at that and we go back to the hypothetical where you're driving down the perspective shown in 40th Street?

A:     Uh-huh.

Q:     Would you agree that if you were driving from that perspective before the shrubbery and the high trees that your view of the entire left side of the crosswalk in terms of your perspective driving down that street would have been obstructed?

A.     Yes.

[Objections]

Q:     You said yes, right?

10

A.     Yes, I did.  If --- from this photo, looking at the photo, if I was driving down, I would not see what was in my left side.

Q:     And it's true as well that you would not have been able to see a pedestrian crossing in that left side from that perspective, correct?

[Objections]

A:     So if it's from the photo as -- yes, it would be very difficult to see a pedestrian crossing the crosswalk from this photo.

Q:     Sure.

A:     If I was driving down this road.

Q:      Sure.  And we're talking about you driving down 40th Street in the perspective shown in Exhibit 4?

A:     Correct . . . [¶] . . .  I mean we're looking right at it.  So it's very obvious, everybody can agree.

In February 2020, Russell was deposed but could not testify about the collision because he had no memory of the accident.

Other discovery established that beginning in 2005, the City allowed a private citizen to "adopt" the Median for maintenance through an "Adopt-a-Spot" program by which citizens can volunteer to maintain gardening for an area that would otherwise fall to the City's Public Works Department.

The record also contains at least two documented car accidents at that intersection, one in August 2009 and another in June 2013.  The City disputes whether the vegetation in the Median played a role in either accident.

In addition, a number of complaints about the vegetation had been lodged with the City over the years.  In December 2013, an employee in the City's Public Works Department contacted the City's call center to pass along the following citizen report: "Citizen is reporting overgrown vegetation in the

Median on the corner of 40th Street and Opal Street. Per citizen, the overgrown vegetation obstructed the view of other cars and caused a vehicle accident." In August 2016, a citizen complaint was lodged with the City about overgrown vegetation "along the 40th Street Corridor," observing they "are not regularly trimmed" and that in some instances "[t]he weeds are taller than full grown people." In April 2017, a resident who had been living near 40th and Opal for six years filed another complaint with the City about visibility issues relating to overgrown vegetation on the Median. He observed that there is a "wall of vegetation, trees, shrubs, and bushes" on the Median "which prevents drivers and pedestrians in [the] area from seeing each other."

Additional witnesses were deposed, and other written discovery completed.

### D. The City's Summary Judgment Motion

In June 2020, the City moved for summary judgment, arguing there were no disputed issues of material fact as to the Russells' premises liability causes of action. In its view, the City could not be held liable for a dangerous condition of public property because no dangerous condition of public property existed at the time of the accident, and no dangerous condition of public property caused the accident. In so arguing, the City relied on Zitani's deposition testimony, in which she repeatedly reiterated that she did not see Russell until the moment of impact due to the sun being in her eyes as she approached the intersection. The City asserted that there was no evidence that any Median vegetation obstructed Zitani's view of Russell.

In opposing the motion, the Russells argued that triable issues of fact existed as to whether the overgrown vegetation in the Median constituted a dangerous condition of public property and whether it was a substantial

12

factor in causing the Russells' harm. They observed that there was a wall of vegetation on the Median that prevented eastbound drivers on 40th (like Zitani) from seeing southbound pedestrians in the northern half of the crosswalk at Opal (like Russell), and vice versa, until a collision was imminent and hence not possible to completely avoid. In their view, these obscured sightlines caused by the vegetation constituted a dangerous condition.

On the issue of causation, the Russells argued that Zitani's claim that she did not see Russell was contradicted by other evidence. Rajeev Kelkar, their accident reconstructionist, asserted in his declaration that the physical evidence, which included the points of rest of Zitani's car and Russell's unconscious body, showed that Zitani had seen Russell *prior* to the collision, which meant the sun did not completely disable her and thus could not have been the sole cause of the collision.

As part of his explanation, Kelkar introduced the concept of perception-reaction time, which is the time it takes for an individual to perceive and react to a potential hazard or situation. For the driver of a car, the perception-reaction time to an unexpected event is typically in the 1–2 second range, and could be longer in certain circumstances (e.g., difficulty of perceiving the hazard, complexity of the situation and the potential reaction options). He added that drivers sometimes look in different directions and locations when driving, and these "looking" tasks take additional time. With these concepts in mind, Kelkar observed that it would have taken Russell 12 seconds to walk the 55 feet from the corner to the point he was struck by Zitani's car. In his view, the vegetation in the Median obscured the view of an oncoming eastbound vehicle to an outbound pedestrian for a significant portion of the time that the pedestrian was in the crosswalk. At that

location, moving at normal speeds, "the vehicle driver and pedestrian have a line of sight to each other for approximately 5 seconds." In those 5 seconds, drivers could be scanning different portions of the intersection looking or looking at vehicle gauges or mirrors and reasonably not see a pedestrian. He added that "[w]hat would have been 10-12 seconds of available line of sight (with no vegetation or vegetation above which a line of sight existed for drivers and pedestrians) is effectively reduced by half or more by the vegetation present at the time of the subject accident."

While Kelkar acknowledged there was "undoubtedly . . . solar glare" in Zitani's eyes as she approached the 40th and Opal intersection, he opined that it was not disabling. Zitani was able to see Russell before impact, brought her visor down to reduce glare, and did not slow down below 25 mph. He concluded that "[t]he vegetation in the center median . . . provides a line of sight obstruction that eliminates a significant portion of the available time that Ms. Zitani (in particular, and eastbound drivers in general) and Mr. Russell (in particular, and southbound pedestrians in general) have to see each other while pedestrians are in the crosswalk and drivers are proceeding eastbound . . ."

The Russells asserted that a jury could reasonably conclude that in addition to the sun being in her eyes, Zitani was unable to see Russell until it was too late to avoid a collision because in the seconds before impact he was hidden from her view by the wall of vegetation on the Median. The Russells also argued the wall of vegetation prevented Russell from seeing Zitani's car and deprived him of the opportunity to take appropriate evasive action to avoid a collision.

In opposition to the City's motion, Zitani similarly argued that had the vegetation not been in the Median, she would have seen Russell before the

14

sun became an issue and slowed down. She asserted there was a triable issue as to whether the vegetation blocked Zitani's view of the left side of the crosswalk and Russell walking in it, such that it reduced her ability to register Russell as an approaching hazard and respond to him prior to encountering the solar glare. She pointed to parts of her deposition testimony in which she stated that it would be difficult for a driver on 40th to see the northern side of the ladder crosswalk due to the vegetation.

In March 2021, following the City's reply and a hearing, the trial court issued a five-page written order granting the City's motion for summary judgment. As to first issue (dangerous condition), the court found: "There is a triable issue of fact whether the vegetation in the median strip was a dangerous condition of public property. [¶] . . . [¶] The vegetation arguably blocked corner visibility and was arguably inconsistent with the guidelines in the Caltrans Highway Design Manual given the speed of vehicles on 40th Street." The court noted that it considered the math of average vehicle speed on 40th, driver visibility to southbound vehicles on Opal, and driver visibility to pedestrians on Opal stepping onto 40th, and found it was "arguable that the vegetation was a dangerous condition of public property." In addition, citing evidence of prior complaints about the vegetation and prior vehicle-vehicle accidents in part caused by the vegetation, the court concluded there was a triable issue of fact as to whether the Russells could prove there was "reasonably foreseeable risk," another element of the premises liability claim.

On the issue of causation, however, the court concluded that "[t]he undisputed evidence demonstrates that the vegetation in the median strip was not a substantial factor in causing the accident." The court explained: "Most significant for the [City's] motion, [Zitani] testified repeatedly that she could not see because the sun was in her eyes." Rejecting the argument that

15

the vegetation may have also been a cause of the accident, the court stated, "[Zitani] testified at her deposition that the vegetation was not the cause of the accident," and cited her testimony that she did not remember the vegetation to be a problem. The court further determined that the argument that the vegetation might have impaired Zitani's ability to see Russell walk across the westbound lane while she was driving east on 40th Street was "speculative and contrary to [Zitani's] clear testimony." It also found the argument that the vegetation might have impaired Russell's ability to see Zitani's car approaching to be speculative given Russell had no recollection of the accident. As a final note, the court observed that when Russell reached the Median, vegetation would not have obscured his view of an oncoming vehicle.

The court entered judgment in the City's favor and dismissed with prejudice the Russells' complaint against the City. The Russells and Zitani separately appealed the judgment. We consolidated the two appeals for purposes of oral argument and decision.

## DISCUSSION

### A. Applicable Law

"The purpose of summary judgment under Code of Civil Procedure section 437c 'is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute.' [Citation.] 'Summary judgment is appropriate only "where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law." ' [Citation.] A moving defendant bears the burden to show that the plaintiff cannot establish one or more essential elements of the cause of action, or that there is a complete defense to that cause of action. [Citations.] If the defendant

16

meets this burden, 'the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to the cause of action or defense thereto.' " (*Hassaine v. Club Demonstration Services, Inc.* (2022) 77 Cal.App.5th 843, 849–850.) A court may grant a motion for summary judgment only if there is no triable issue of material fact and the moving party is entitled to judgment in its favor as a matter of law. (Code Civ. Proc., § 437c, subd. (c); see also *Johnson v. Superior Court* (2006) 143 Cal.App.4th 297, 304].)

"On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334.) We "consider all of the evidence" and all of the "inferences" reasonably drawn therefrom (Code Civ. Proc., § 437c, subd. (c)) and must view the evidence and inferences "in the light most favorable to the opposing party." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*); *Creekridge Townhome Owners Assn., Inc. v. C. Scott Whitten, Inc.* (2009) 177 Cal.App.4th 251, 255 ["Because a summary judgment denies the losing party its day in court, we liberally construe the evidence in support of that party and resolve doubts concerning the evidence in that party's favor."].)

Government Code section 835 "is the sole statutory basis for a claim imposing liability on a public entity based on the condition of public property. [Citation.] Under section 835, a public entity may be liable if it creates an injury-producing dangerous condition on its property or if it fails to remedy a dangerous condition despite having notice and sufficient time to protect against it." (*Brenner v. City of El Cajon* (2003) 113 Cal.App.4th 434, 438–439 (*Brenner*).) To recover in an action against a public entity under Government

17

Code section 835, a plaintiff must prove: "(1) a dangerous condition existed on the public property at the time of the injury; (2) the condition proximately caused the injury; (3) the condition created a reasonably foreseeable risk of the kind of injury sustained; and (4) the public entity had actual or constructive notice of the dangerous condition of the property in sufficient time to have taken measures to protect against it." (*Brenner*, *supra*, at p. 439.)

To establish causation, a plaintiff must show that a physical condition of the public entity's property was a " 'substantial factor' " in bringing about his or her harm. (*Bowman v. Wyatt* (2010) 186 Cal.App.4th 286, 312.) " ' "[C]ausation . . . is ordinarily a question of fact which cannot be resolved by summary judgment. The issue of causation may be decided as a question of law only if, under undisputed facts, there is no room for a reasonable difference of opinion." ' [Citation.] Causation must be established by nonspeculative evidence." (*Kaney v. Custance* (2022) 74 Cal.App.5th 201, 212 (*Kaney*).)

## B. Zitani's Deposition Testimony

As an initial matter, Zitani argues that certain questions posed to her at deposition lacked foundation, were ambiguous, and forced her to express legal opinions. She asserts that this court should sustain objections made at the deposition and disregard her answers.

We will not consider this argument. "Evidentiary objections not made at the [summary judgment] hearing are deemed waived." (Code Civ. Proc., § 437c, subd. (b)(5).) While counsel lodged numerous objections to various questions asked of Zitani during her deposition, there is nothing in the record indicating that Zitani ever raised these objections in the trial court in opposing the City's summary judgment motion. She fails to cite to any

18

portion of the record where she or the Russells objected to these questions in the course of the summary judgment proceedings, and we located no such objections in our review. Accordingly, we conclude Zitani waived any objection to the admission of her deposition testimony, and we shall consider her testimony fully in our analysis of causation, the crux of this appeal, which we turn to now.

## C. Causation

The City as the moving party met its initial burden on summary judgment and thus shifted the burden to Appellants to show that a triable issue of material facts exists as to the causation element of the premises liability claim. Based on all admissible evidence, we conclude Appellants made a showing sufficient to survive summary judgment. (*Crouse v. Brobeck, Phleger & Harrison* (1998) 67 Cal.App.4th 1509, 1524 ["Doubts as to the propriety of granting the motion must be resolved in favor of the party resisting the motion."].)

### 1. Whether Vegetation Prevented Zitani from Seeing Russell

Here, the trial court hung its ruling on a finding that the accident was caused, solely, by solar glare. However, a trier of fact could reasonably infer that the solar glare was not entirely disabling to Zitani as she approached the 40th and Opal intersection. Zitani testified that she could still see the road as she drove up 40th and lowered her visor, which would have aided in blocking glare. She did not further reduce her speed below the slower 25 mph pace and continued to drive, which a driver completely blinded would be unlikely to do. Further, her reduced speed (25 mph), her car's place of rest after striking Russell (12 feet after the crosswalk per the police report), and Kelkar's testimony on the stopping distance that would have been required at

19

that speed had Zitani only started braking upon impact (60-85 feet) sufficiently established that Zitani saw and began reacting to Russell before impact, rather than right at the moment of impact as she had testified. Indeed, the City agreed it was an undisputed fact that the physical evidence indicated Zitani saw Russell before impact. From this evidence, a trier of fact could reasonably infer that the solar glare was not a complete impediment to Zitani's vision that foreclosed other causes contributing to the accident.

A trier of fact could also reasonably infer that the vegetation in the Median prevented Zitani from seeing and responding to Russell sooner. Through the declaration of Kristen White, the mechanical engineer who inspected, measured, and photographed the 40th and Opal intersection, the City provided key measurements and features of the accident area. This evidence showed that the east side of the Median narrowed to accommodate a left-turn lane for cars seeking to make a left onto Opal from 40th. This narrow part of the median contained short succulents and bushes that were no more than 3 feet high. There was also evidence showing that the middle of the Median was wider and had taller and thicker bushes and trees. The record contains two photos near the intersection taken by a police evidence technician from a westward view which depict the Median vegetation on the day of the accident. One photo (OCA 00031) depicts some of the taller vegetation in the Median:



OCA 00031



OCA 00036

The evidence also established that for an eastbound driver on 40th, the vegetation in the Median obstructed the driver's view of a person standing on the northeast corner of the intersection at 40th and Opal.  In her declaration, White stated: "For an eastbound driver on 40th Street in the number one lane *starting* at a distance of 140 to 145 feet from the crosswalk, there is no visual obstruction to a person standing on the northeast corner of the

21

intersection . . .", suggesting that at a distance *greater* than 140 to 145 feet from the crosswalk – at the wider part of the Median – there would be a visual obstruction to a person standing on that corner. (Emphasis added.) Zitani herself testified that, based on Exhibit 4, if she were driving down 40th her view of the entire left side of the crosswalk at the 40th and Opal intersection would have been obstructed by the vegetation, she would not have been able to see her left side, and it would have been difficult to see a pedestrian crossing 40th.

The Russells' traffic engineer, Laurence Neuman, measured the sight distance from the corner of the intersection at the time of the accident to be 114 feet, when in his view the minimally acceptable distance was 200 feet. He also observed that drivers approaching the intersection eastbound on 40th could not see pedestrians in the northern half of the crosswalk due to the vegetation.

Further, there was evidence that Zitani's view of Russell crossing the street was obstructed based on her driving the stretch of 40th between Shafter and Opal where her line of sight to the northeast corner of the 40th and Opal intersection would have been obstructed by the taller vegetation in the Median. It was undisputed that in the moments before the accident, Zitani was driving in the left eastbound lane of 40th, and Russell was walking southbound in the crosswalk across 40th. From the end of the crosswalk at the northeast corner of the intersection to the area of impact was approximately 51 to 57 feet. Based on the typical male pedestrian walking speed of 3 mph, the Russells' accident reconstructionist Kelkar calculated that it would have taken Russell walking at normal speed approximately 12 seconds to get from the curb to the area of impact. Meanwhile, Zitani testified that she was traveling at a reduced speed of 25

22

mph. According to White, a vehicle travels 37 feet in 1 second and 200 feet in 5.5 seconds, and the distance from the east end of Shafter to the crosswalk at 40th and Opal was 300 feet. It would have taken Zitani approximately 8 seconds to drive the 300 feet from Shafter to the crosswalk at the 40th and Opal intersection. As noted, until Zitani was 140 to 145 feet from the intersection (based on the City's larger measurement), her view of the northeast corner of the intersection would have been blocked. Based on the evidence, it is a reasonable inference that Russell was walking in the northern part of the crosswalk at the same time Zitani's view of him would have been obstructed by the vegetation.

Finally, it was disputed whether from the point there was no obstructed view on 40th (i.e., 140 to 145 feet from the point of impact) there was enough time for Zitani to respond to a pedestrian in the crosswalk. The evidence indicates that at 25 mph, Zitani would have gotten to this point approximately 4 or 5 seconds before reaching the crosswalk. In the City's view, five seconds of clear sightlines between a driver and pedestrian is more than sufficient for a response. However, according to Kelkar, based on perception-reaction time, even 5 seconds would not have been an adequate time to respond considering drivers are engaged in a variety of looking tasks such that their gaze is not always fixed in a particular location or direction. Zitani herself stated that she constantly scanned the road ahead to look for upcoming traffic signals and pedestrians in crosswalks. For all these reasons, summary judgment was improper.

Based on our review of the evidence, we are not persuaded by the City's assertion that the only available conclusion was that the sun glare caused the accident and that contentions positing the vegetation as an additional cause of the collision consist solely of multiple layers of speculation.

23

For example, the City contends the Russells' argument that Zitani started braking before hitting Russell because she saw Russell prior to contact was speculative. Not so. As noted, the City agreed that it was undisputed that the physical evidence in this case established that Zitani must have seen Russell before the collision. Zitani's deposition testimony also supports the view that she started braking only because she saw Russell. She stated: "Truthfully, I don't know how I struck him. I thought he went under my car truthfully. I didn't – all I know is I hit him. I just saw him as I was – as I approached. I didn't see anything else. I just saw him, and I realized I hit him, and I stopped the car immediately." She added that she "slammed on the brakes."

The City also argues that even if the sun was not entirely disabling, it was disabling enough to be the sole cause of the accident. But this is not the only inference that can be made from the evidence. Based on the evidence that the sun did not completely block Zitani's view, a trier of fact could reasonably infer that she would have been able to see an adult in the crosswalk unless something else blocked her view. This is a reasonable inference, which we must view it in the light most favorable to Appellants as the opposing parties. (*Aguilar*, *supra*, 25 Cal.4th at p. 843 ["In ruling on the [summary judgment] motion, the court must 'consider all of the evidence' and 'all' of the 'inferences' reasonably drawn therefrom [citation], and must view such evidence [citations] and such inferences [citations], in the light most favorable to the opposing party."].)

In its arguments, the City emphasizes Zitani's testimony that she hit Russell due to the sun, not because any vegetation blocked her view of him. We too recognize that she repeatedly attributed her inability to see Russell completely to the solar glare. However, considered in its entirety, Zitani's

24

deposition testimony does not preclude the vegetation being a substantial factor in the accident. Zitani testified that it was the sun that obstructed her vision and thereby caused the collision, but this testimony does not necessarily address the several seconds leading up to the collision. Further, when shown an image of 40th between Shafter and Opal, she acknowledged that she would not have been able to see her left side from behind the shrubbery and high tress in the Median. These answers make ambiguous the role the vegetation had, if any, in the accident, and we resolve any evidentiary doubts or ambiguities in favor of the party opposing summary judgment. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768; *Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 119 [where "deposition testimony . . . may support conflicting interpretations, 'the task of disambiguating ambiguous utterances is for trial, not for summary judgment' "].)

In addition, referencing Exhibit 4, the City contends any argument that relies on the Google Maps image presented at deposition is improper because the image was unauthenticated and inadmissible. To the extent the City objected to this evidence as part of the summary judgment proceedings, the trial court overruled all of them. The City did not challenge those rulings on appeal, so the City forfeits any claim that we should exclude any evidence to which its objections were overruled. (*Frittelli, Inc. v. 350 North Canon Drive, LP* (2011) 202 Cal.App.4th 35, 41 [appellant who "does not attack the [trial court's evidentiary] rulings on appeal . . . forfeit[s] any contentions of error regarding them"].)

The City also criticizes Kelkar's opinion as too conclusory to be relied upon and lacking in evidentiary value because it conflicts with Zitani's own testimony. Any suggestion that Kelkar's declaration is inadmissible is

forfeited for the same reasons as above. Further, we disagree that the record is devoid of evidence that would support Kelkar's conclusions, including the vegetation in the Median and the limited sightlines at the intersection resulting from it.

In sum, and based on the totality of the evidence, a trier of fact could reasonably infer that longer sightlines unobstructed by vegetation would have made Russell visible to Zitani sooner and prompted her to react sooner. More specifically, a trier of a fact could reasonably infer that had the vegetation in the Median not obstructed Zitani's line of sight to the northeast corner of the intersection and the northern part of the crosswalk where Russell was, Zitani would have seen Russell crossing and had more than 4 or 5 seconds to react to his presence and avoid collision. Because there is a triable issue of fact as to whether the vegetation in the Median was one of the substantial factors that caused the collision, summary judgment was improper.

In reversing summary judgment, we do not conclude that the vegetation blocked Zitani's view of Russell crossing the street. Rather, we conclude only that there is evidence from which a trier of fact could reasonably infer the causation element required for the premises liability claim against the City. Based on the evidence in the record, and any reasonable inferences drawn therefrom, it shall be up to the trier of fact to conclude whether the vegetation blocked Zitani's view of Russell, precluding her from responding sooner, and was thus a substantial cause of the accident.

### 2. Whether Vegetation Prevented Russell from Seeing Zitani

The Russells additionally argue that a triable issue of fact exists as to whether the overgrown vegetation in the Median prevented Russell from

26

seeing Zitani before he crossed the street. We agree there was enough evidence from which a trier of fact could reasonably infer that Russell would not have started to cross the street in the first place had the vegetation not blocked his view of Zitani's approaching car. The record includes the following photograph taken by a City employee in May 2019 showing the westward view of 40th from the northeast corner of the intersection:



Russell AR 1082

In addition to the other evidence discussed, a trier of fact could reasonably infer Russell's sightlines towards oncoming eastbound traffic behind the vegetation on 40th were not clear and prevented him from making a fully informed decision as to the propriety of crossing the street. For this reason, too, summary judgment was improper.

In light of Russell's lack of recollection of the accident and the absence of witness testimony describing what Russell was doing, the City states that "[w]ithout any evidence of Russell's perspective, there is nothing to support a reasonable inference that the vegetation obscured Russell's view while he

was standing on the curb."  However, Russell's lack of memory is not fatal to the Russells' alternate theory of causation and none of the City's additional arguments persuade us that the Russells have failed to raise a triable issue of fact on this issue.  (See *Kaney*, *supra*, 74 Cal.App.5th at p. 217 [plaintiff's inability to remember fall did not mean she lacked nonspeculative evidence of causation "provided the evidence [gave] rise to a reasonable and probable inference that the defendant's negligence was a substantial contributing factor"].)

In light of our decision reversing summary judgment, we need not address Appellants' remaining contentions.

## DISPOSITION

The summary judgment in favor of the City of Oakland is reversed. The parties shall bear their own costs on appeal.

28

 

 

_____
Petrou, J.

WE CONCUR:

_____
Fujisaki, Acting P.J.

_____
Rodríguez, J.

A162798, A162878/*Russell et al., v. Zitani et al.*

Photograph Appendix:

Photograph 1: Page 3 (Aerial photograph of intersection between 40th Street and Opal Street)

Photograph 2: Page 7 (Labeled as Exhibit 4; Median on 40th Street)

Photograph 3: Page 21 (Tall vegetation on Median)

Photograph 4: Page 21 (Cracked windshield)

Photograph 5: Page 27 (Westward view of 40th Street from NE corner)